August 2, 2017 Executive Summit 2021 Sarah Bohr, Attorney for the Appellate All right, whenever you're ready. Good morning. Sarah Bohr, Attorney for the Appellate. We very much appreciate the opportunity to present oral argument on this very interesting migraine headache case. The record shows that starting in 2014, Ms. Wright began treating for her headaches with a neurologist, Dr. Ginsburg. And in June of 2019, Dr. Ginsburg noted that even though she was being treated with Botox eight to ten times a month, that was better than her near daily migraine headaches she had before. The diagnosis was updated in March of 2019 to chronic intractable migraine headaches, as well as status migranosis, which is a migraine that lasts for at least 72 hours. She continued to have migraine headaches despite treatment. In December of 2019, the FDA approved a new medication for migraine headaches, Ubrevly, and she started taking that in July of 2020. And even with that, she continued to have three to four headaches a week. A typical migraine was ascribed by Dr. Ginsburg as resulting in nausea, photophobia, sonophobia, and aggravated by movement. In March of 2021, even though she was taking Botox, her headaches were reduced from four a week to two a week. She was also taking the Ubrevly drug ten times a month, meaning this is an abortive drug. So you take that when you start having a migraine and it stops the migraine. So she was taking ten a month. So this evidence from Dr. Ginsburg, her treating neurologist, was never addressed by the ALJ in the decision. The vocational testimony at the hearing documented that if somebody, an acceptable level of absenteeism for work is one time a month, and if she's having these serious migraines at least two times a month to four times a month, then this would preclude work activity. The ALJ did find that the migraine headaches were a severe impairment. But the ALJ, we submit, failed to properly evaluate the migraine headaches and their effect on her at step three, which is the medical listing step, as well as step four, which is residual functional capacity, as well as in evaluating her subjective complaints. The facts of this case are quite analogous to the Pupo case decided by this court in 2021. It's referenced in our brief, 17-F-4-10-54. In that case, the claimant had a non-severe impairment that the ALJ had not addressed, incontinence. And this court held that that was improper, that the ALJ is required to consider both severe and non-severe impairments, and sent the case back. Here we have an impairment that is severe, as found by the ALJ, yet the ALJ never properly evaluated the evidence from her treating neurologist, never mentioned the neurologist by name, and never properly evaluated the severity of the headaches on her ability to work. Let me ask you about that. Did not the administrative law judge acknowledge that Ms. Wright's testimony that she had experienced migraines three to four times a week, the ALJ did look at that? Yes, the ALJ did look at that, but the ALJ found that her treatment was effective in controlling her symptoms. This is in the record at page 35. And the record, the evidence from the treating neurologist does not document it was effective, even though she's doing the most advanced treatment you can have for headaches, Botox, which is trying to prevent them, and also the Uberly drug. She still had them at least two times a week, two times a month. So therefore, they weren't effective. This finding by the ALJ is not supported by substantial evidence, suggests that treatment has been effective in controlling her symptoms. Also, the ALJ failed to comply with a new ruling, 19-4P. He never mentioned the ruling in the decision, nor did he apply the ruling's requirements. And the ruling is very specific. It talks about, in looking at, most of the ruling deals with what is a medically determinable impairment, and it talks about different kinds of headaches. And the ALJ found that she had a severe migraine headache, so that was met at step two. But also, it talks about, in number eight of this ruling. Help me with this. I was looking at the ALJ's report. And at one point, the judge says, recognizing the issue, writes, the claimant's history of migraine headaches is well documented in the record. The claimant received Botox injections for her headaches. However, the claimant's MRI was normal on blank and blank dates. Furthermore, the record documents numerous medical visits when she denied having headaches, which is inconsistent with debilitating migraine headaches, and suggests that treatment has been effective in controlling her symptoms. And the ALJ makes various citations about it. I think you could say the ALJ was wrong, but I think you have to acknowledge that the ALJ looked at the record and relied upon at least those propositions. Why couldn't the ALJ rely on these references that were in the record? Well, these records you're citing are not, they were physicians that were treating her for other impairments, and she had, and her primary care physician acknowledged that she was being treated by the neurologist. None of these exhibits that are cited cite to the neurologist. He only cited to other medical providers who did not treat her condition. And this court has held that when you have a condition that you're going to a specialist, you don't necessarily tell every doctor you're going to about a condition. This woman had many impairments, multiple impairments. But in those records, specifically from March and May 2020 and December 2020, she's... I'm sorry, I can't hear you. She specifically said no headache. So it's different than saying, you know, when you go to a doctor and you have to fill out a form, you know, are you suffering from any of these things? For headaches, she wrote no. But there were some periods of time maybe she was better, but she never got totally, according to her treating neurologist, she still had headaches at least twice a month, all the way through the whole case. And she had these serious headaches that are called the status myognosis, which can last up to 72 hours. That's defined in our brief, I think at page 45. I mean, I guess I understood the references to no headaches to mean, and maybe I just misunderstood, that at the moment that she was at the doctor that day, that's not why she was there. She wasn't suffering from a headache. Not that she didn't continue to suffer from migraines. Did I misunderstand that? Yes, because she doesn't have them all the time. No one is saying she doesn't have a continuous migraine. This is an intermittent kind of impairment that happens and then you're better. I mean, you don't have them all the time. But she still, at its worst, was having them every day, according to Dr. Ginsburg. Then when he started treating her, she improved. And then she started having them instead of he was happy. She was having them only eight to ten times a month instead of every day. And then she tried the new medication that was allowed by the FDA. And after that, she was still having three to four headaches a week. So she still had them, even with all this treatment. And she was taking the abortive medications, at least she was getting ten of those at a time. And so she was getting like ten a month. So she was getting ten headaches a month based on the medication. You don't take that medication unless you are having a headache. And it's supposed to stop the headache. Let me ask you a question. Is what you're asking this court to do is to remand for the administrative judge to look at 19-4B-P? Yes, we're asking the court to send it back to evaluate the record based on Solsky ruling 19-4P, and also to address Dr. Ginsburg's records, which weren't properly addressed in the decision. This is a specialist. This is a person who knows most about her headaches and was never mentioned, never addressed in the decision. And 19-4P is interesting because it references the listing that's for seizures. And it says that that's the most analogous listing that would evaluate headaches. And 19-4P specifically talks about that if you have headaches for at least once... It says here if you have headaches, Part B requires at least once a week for three consecutive months despite prescribed treatment. This is what's stated in 19-4P. And it requires a detailed description of the average headache, which we have in Dr. Ginsburg's records. And that was never discussed. The ALJ never mentioned this ruling, never addressed it in the decision, because this could be a medical equivalence finding, which was never done. We also allege that the failure to properly address the migraine headaches also impacted the evaluation of subjective symptoms because the ALJ... That affects her ability to work. The vocational testimony, as mentioned, says if you're absent more than once a week... Once a week is a tolerance by employers. I'm sorry, once a month. One absence a month is a tolerance by employers for absenteeism. And if she has these headaches at the frequency, as the doctor found, she would not be able to work for those days when she had these severe headaches, many of which last for up to 72 hours. Can I ask you, how do we address the SSR17-2P? Thank you for that question. 17-2P was enacted prior to 19-4P. So two years after 17-2P was enacted, 19-4P was enacted. And 19-4P talks, as I mentioned, about the medical equivalence to a listing. 17-2P does allow, at the end of this ruling, it has an articulation requirement. So 17-2P talks about the fact that an adjudicator must provide a rationale for a finding of medical equivalence in a decision that is sufficient for a subsequent reviewer or court to understand the decision. Generally, this will be the adjudicator identifying the specific listing section involved, articulating how the record does not meet the requirements of the listed impairment, and how the record, including ME or medical support staff, establishes an impairment of equivalent severity. Here, the relevant listing was never mentioned. So this doesn't apply. The case of Williams that was presented by the government last Friday is not relevant. That was an anxiety case where the ALJ addressed anxiety, and this ruling would say that was sufficient. He addressed anxiety. He didn't have to get into the specific details. All right, thank you, Ms. Bohr. And you've reserved four minutes. We'll hear next from Ms. Holland. May it please the court, Laura Holland, for the Commissioner of Social Security. Wright argues that the ALJ erred by not sufficiently considering her migraine headaches in finding that she was limited but not disabled under the strict standards of the Social Security Act. But the ALJ adequately discussed her headaches in line with agency regulations and rulings. The court should defer to the ALJ  under the deferential substantial evidence standard of review that governs Social Security cases. So it seems like there are a couple of unusual things about this case. The first thing that I noticed is that that listing does not appear in the decision at all. But the ALJ talks about five other listings that the ALJ considered, which makes it appear as though the ALJ did not consider the listing that we would use for the migraines, right? I mean, the seizure, whatever. And so that seems like it might be a problem. I don't know how we can tell that the ALJ actually evaluated that listing, which I think the ALJ had to do. So my first question is whether you can explain why that is not a problem that warrants our remanding for the ALJ to specifically address that listing. Yes, Your Honor. So as the court is aware, there is no specific listing for migraine headaches. 19-4-P... The seizure one. Yeah, 11.02. So 19-4-P specifically addresses migraine headaches. Most of the SSR is related to whether, you know, how to determine whether a headache is a medically determinable impairment. Here the ALJ found it was. The ALJ found it was a severe impairment. The ALJ found that she did not meet or medically equal any listed impairment, which I will circle back to is relevant. And then the ALJ proceeded to discuss her headaches throughout his or her RFC assessment finding the headaches. So a couple of things about that. The first thing is, as I said, the ALJ does specifically identify five listings that the ALJ considered.  The ALJ does not specifically identify the migraine listing. That's correct. So that right there just sort of pops out at you. Mm-hmm. The second thing is that the ALJ seems to be referring to the, I don't know, the general physician or the intern notes, but not at all to the headache specialist, the neurologist.  And those notes reflect, they seem to me at least to reflect, that she continued to suffer, even while on medication, from migraines, you know, multiple times a month, which would seem like at least on the surface that it might meet the migraine list. Mm-hmm. So a few things. So the ALJ did discuss Dr. Ginsburg's notes. In fact, they're cited on nine pages of the decision. They're at 26F and 49F. The ALJ also specifically mentioned Dr. Ginsburg by name on page 26. So it's not the case that the ALJ did not look at Dr. Ginsburg's records. This is a case involving 2,000 pages of medical records. So to get back to your point about the 19-4P, there's no requirement that the ALJ cite 19-4P in her analysis. That is true. There is no requirement. But it is awfully weird. I mean, you have to acknowledge that it's unusual that the ALJ would cite five different listings that the ALJ compared the records to, but not that one. Yeah, certainly. And again, I would point the court to the fact that this individual has a lot of impairments. And so the ALJ was going through the 2,000-page record. Right, but it makes it seem almost as if the ALJ knew, considered the migraine, but didn't consider it with respect to a listing as to whether or not it was a true disability. Well... Because it's sort of... It's like you could say, well, I have this particular issue, and so he addresses it, but he doesn't look at it or she doesn't look at it with respect to the actual listing that you need to consider to see whether or not it meets the criteria. Because it's not just about discussing it. It's also you need to consider it with respect to the criteria that the listing requires, right? You do, but going back to 19-4P, the listings, there is no... As you know, there's no headache listing. So the most analogous listing is 11.02, which deals with seizures. SSR 17-2P, which the court is aware of, it lists specific things that must be in the record for an equivalency finding under the listings. And those three things are a prior administrative medical finding establishing equivalency, a medical expert opinion establishing equivalency, and a report or a report from the Appeals Council medical staff establishing equivalency. So SSR 17-2P governs a finding of equivalency, and it says two important things in this case. It says that there is simply not the evidence here to establish medical equivalency because none of those three things are in the record. And two, it says on the next page that the ALJ is not required to articulate specific evidence supporting his or her finding that the individual's impairment does not medically equal a listed impairment. Generally, a statement that none of the individual's impairments meet or medically equal a listing is sufficient, which is what we have here. The ALJ Step 3 finding says no impairment is met or medically equaled. So I concede that the ALJ's thought process could have certainly been more clear here with discussion of headaches. That being said, this record was extremely dense. And I would also like the... Let me ask you what we should do with Owens. We have said in Owens that we should decline to affirm simply because some rationale might have supported the ALJ's conclusion. You know, if we can't tell what the ALJ did, that we should remand it and, you know, have the ALJ tell us. Why wouldn't that govern here? Because I think, Your Honor, you can tell what the ALJ did here. She found severe migraine headaches. She found that there was no listed impairment that was met or medically equaled, which is sufficient articulation under 172P, and then went on to mention... Where do you see that with respect to migraines? I'm sorry, Your Honor? Where do you see that with respect to migraines? Specifically with respect to migraines? Yes. In 172P? Yes. It's not as specific to migraine as... But that's the issue. I mean, when we have something that comes to us on appeal, we have to have a record so that we can review the record and consider whether or not the ALJ did what he or she is supposed to do. And so here, there's no discussion of the medical source's description of migraines during... I mean, they have that, but it doesn't have a discussion about whether or not, you know, the criteria is met or not met with respect to migraines. That's correct, but as I pointed out, in 172P, that dictates what is required to find equivalency, and the evidence is not here, and the ALJ was not required to specifically articulate that when we're talking about medical equivalency for a listed impairment. Listed impairments are impairments that are so severe they're per se disabling. And I would also point the court to SSR 19. That's true, but if her medical records show that there are 10 days a month, so once every three days on average, that she has a migraine that's so severe that she has to take Ubrelvi, and she could have it for up to 72 hours, and during that period, she can't work, doesn't that seem like it would equal the listing? No, because in order to equal the listing, you have to have one of the three pieces of evidence that I mentioned earlier that are not here. A doctor saying this person medically equals a listing. It's not a finding that the ALJ could even make on his own. There would have to be some medical evidence from a doctor saying that, and that is not present in this case. What we do have is Dr. Ginsburg's records. We have records that the ALJ cited from other visits with other providers where, as was already discussed, she's denying headaches. I would also point out that Wright didn't even list migraine headaches in her application as an impairment that was disabling. She didn't mention it to Dr. Luna, who the agency hired to examine her physical impairments, didn't even mention migraine headaches at that consultative examination. She mentioned headaches only once in her various function reports. She briefly mentioned them at the administrative hearing, saying she had them three to four times a week, but didn't elaborate how long they lasted, what the effects were. Her attorney didn't mention them in the opening statement to the ALJ as to what her... But even in the ALJ's order, it says she testified that she has migraine headaches three or four times a week. That's not normal, three or four times a week of having migraines. Yeah, that's correct. And she was, you know, under the treatment of the neurologist taking Botox, which the neurologist was expressing was effective in controlling her symptoms. And again, I would reiterate that there was no doctor or other medical source in this case who offered an opinion that her migraine headaches were disabling or otherwise indicated specific functional limitations stemming from her headaches. It's just not in this record. And, you know, she also never once went to the ER for migraine headaches. So those... You know, when the ALJ looked at this very lengthy record with this individual with multiple impairments, it was reasonable for the ALJ to discuss headaches, find them to be severe, but find them not disabling. And I would just, you know, go back to the 19-4-P. It's not as if 19-4-P, because it was issued two years after 17-2-P, somehow overrides 17-2-P. They are both in effect, and an ALJ must comply with both of them. And the ALJ did that here, even though the ALJ did not cite 19-4-P, the ALJ followed the outline of 19-4-P on how you discuss headaches. And I would also point out, with regard to two cases that were mentioned, PUPO is distinguishable in that that case, the ALJ found no severe incontinence and did not discuss it in assessing the RFC whereas here, the ALJ found severe headaches and discussed the headaches in assessing the RFC. And Williams, the fact that it was a case dealing with anxiety and depression is irrelevant. It still talks about what an ALJ must do or not do when discussing equivalency. And, you know, the court found that the ALJ did not need to specifically discuss equivalency, that the general finding that no listing was met was sufficient, and this court should find the same. Unless your honors have any more questions, I will conclude by reiterating the ALJ did everything she was legally required to do, and her findings are sufficient under the deferential substantial evidence standard of review. All right, thank you, Ms. Holland. And Ms. Moore, you have reserved four minutes. Before you get started, let me ask you. Ms. Holland says that under Rule 17.2p, none of the evidence that is necessary to establish equaling a listing is in the record anyway. So there was no way that the ALJ could have determined that Ms. Wright medically equaled the migraine listing. What is your response to that? We believe there was sufficient evidence in the record from Dr. Ginsburg, which was not addressed, that would establish that at least it appears that she medically equaled the listing based on the frequency of the headaches and the description of the headaches that was stated in Dr. Ginsburg's record on multiple occasions. So, as I understand, Ms. Holland, I think what she's saying is that Dr. Ginsburg would have had to have said that she medically equaled the listing. Are you saying that that was in Dr. Ginsburg's records? No, and we don't believe that's required. And, in fact, as counsel pointed out, 17.2p does provide that generally medical equivalence is made by a medical expert that Social Security obtains. And the ALJ has to rely on that medical evidence. But the ALJ has a right to request a medical expert to come to the hearing to provide that testimony. The ALJ has a duty to develop the record when you have the kind of evidence we have here. And I do believe that even in 17.2p, as I mentioned earlier, there is an articulation requirement, and it says the ALJ and adjudicator at the hearings or AC level must consider all evidence in making a finding that an individual's impairments medically equals a listing. To make a finding, it talks about what they have to do, and the adjudicator must provide a rationale in a decision, and as I said earlier, generally a statement is not generally sufficient, but here the ALJ never addressed the, as you noted, never addressed the relevant listing to headaches. So it's not clear that the ALJ perhaps even realized that was in the listing, in the ruling. It may not have realized that 11.02 is referenced in 19.4p, because the ALJ neither referenced 19-4p, nor did the ALJ address the relevant listing. So you can't even be sure the ALJ even knew about this listing. ALJs don't always follow all the rulings that are in effect. And it is a relatively new listing. Pardon? It is a relatively new listing. It's a relatively new listing, and we find in... I do appellate work in social security cases, and I find many decisions, the ALJs don't cite the relevant listings for certain impairments. It's not uncommon. There's a lot of rulings, a very heavily regulated decision-making process in social security cases. And I wanted to mention that while the ALJ did mention Dr. Ginsburg, it was only in reference to sleep apnea. However, the medical record shows that the claimant repeatedly denied having symptoms of sleep apnea, including shortness of breath, during her July 14, 2020, medical visit to Dr. Paul L. Ginsburg, M.D. And that was the extent of the discussion about him, and that was nothing to do with headaches. So in our view, there was insufficient articulation regarding the headaches, insufficient consideration of the severity of the headaches, and insufficient findings, you know, failure to consider the relevant listing for migraine headaches. And certainly, we're not saying that the... that this court or the ALJ... We're just asking the court to go back... the case to go back for a proper evaluation in the first instance. The district court attempted to address this issue by coming up and doing an analysis and coming up with its own finding that there was no medical equivalence. But if you look at the district court's decision, they relied on Zebley, which is an older case that only talked about one way of finding medical equivalence. The regulations were subsequently amended, and now we have three ways of finding medical equivalence. And that's... so we submit that this case should go back for a proper evaluation of 19-4-P, Dr. Ginsburg's record, and whether the claimant medically... chronic migraine and tractable headaches, medically equaled illicit impairment. All right, thank you very much, counsel. Our last case for today is Yin versus Commissioner of the Florida Department of Education.